**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry Joe RAMACCI, Defendant– Appellant.**

**No. 93–1887.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 14, 1993.

Decided Jan. 19, 1994.

Barry R. Elden, Asst. U.S. Atty., Matthew C. Crowl (argued) Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Leonard Goodman (argued), Jeffrey B. Steinback, Andrew M. Plunkett, Genson, Steinback, Gillespie & Martin, Chicago, IL, for defendant-appellant.

Before CUMMINGS, BAUER, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Larry Joe Ramacci pled guilty to conspiracy to counterfeit over $600,000 in United States currency, a violation of 18 U.S.C. § 371. He now appeals two matters with respect to his sentence. First, Mr. Ramacci argues that the district court was mistaken in including some $240,000 of uncompleted bills in the total amount for sentencing purposes. Second, Mr. Ramacci maintains that the district court erred by classifying him as an "organizer, leader, manager, or supervisor" of the conspiracy pursuant to U.S.S.G. § 3B1.1(c). For the reasons that follow, we affirm the judgment of the district court.

I

BACKGROUND

Larry Joe Ramacci was a construction worker who was employed in his family's business in suburban Chicago. Apparently, Mr. Ramacci became interested in the idea of counterfeiting after William Scoglio, a coworker who had some past printing experience, told Mr. Ramacci that he had once printed some counterfeit currency. This conversation began a chain of events between November 1991 and May 1992 which ultimately led to Mr. Ramacci's arrest and conviction.

Mr. Ramacci and Scoglio eventually agreed that Scoglio would help set up the printing operation for $200 in cash. Mr. Ramacci rented storefront space in a small strip mall in Chicago Heights, Illinois which became the base of operation. After identifying some of the necessary printing equipment, Scoglio apparently was given his fee and was only involved much later in the operation when he was telephoned to give advice on altering the color of the counterfeit bills. Scoglio was not charged in the conspiracy.

After he consulted Scoglio, Mr. Ramacci contacted a local printing equipment company about purchasing a press. Mr. Ramacci used the alias "Jim Benson," and he made clear to the supplier that he wished to deal in cash. "Benson" asked whether the invoice could be made out in the name of his "partner," Larry Ramacci. The pressman became suspicious of Mr. Ramacci, and placed a call to the United States Secret Service. When the equipment Mr. Ramacci ordered was delivered to the storefront, an undercover Secret Service agent accompanied the delivery men. Mr. Ramacci signed for the press using the name "Jim Benson," and paid the driver $2,000 in cash. He then asked the delivery crew where he could purchase some high quality, high rag content paper. He indicated that he expected to open for business in approximately one month. The Secret Service continued their surveillance as the fledgling operation attempted to establish itself.

Mr. Ramacci then paid cash for a light table, a paper cutter and a folder. Now using the name "Steve," he located a paper supplier and ultimately placed an order for 1,000 sheets of high rag content paper. Once again, he paid in cash. "Steve" left the telephone number for J.R. Construction, the Ramacci family business. The paper supplier also alerted the Secret Service.

Returning to the press supplier, Mr. Ramacci stated that "Jim Benson" was no longer involved in the business, but he, Mr. Ramacci, was. He ordered new rollers, printing blankets, and photographic negative sheets for his press. Mr. Ramacci asked the pressman if he would be interested in working for him, and when the pressman said no, Mr. Ramacci persisted. The pressman eventually relented and gave Mr. Ramacci the name of the second co-conspirator, Todd Torres, a skilled printer who had previously expressed an interest in part-time work. Torres worked at a local college print shop.

The third man charged in this conspiracy was Eric Baker, a silk screen printer. Initially, Baker just wished to sublet some space for his silk screen tee shirt business, and the strip mall's landlord introduced him to Mr. Ramacci. A short time after Baker moved into the shop, however, he became involved in setting up the counterfeiting operation.

Mr. Ramacci then phoned Torres and explained to Torres how he could make "big-bucks." When Torres came by to help clean and repair the press, Mr. Ramacci recruited him into the operation by offering to purchase him a new Harley Davidson motorcycle. Torres then accepted Mr. Ramacci's offer to help in the counterfeiting plan.

Torres generated the essential negatives and plates at the college print shop from genuine currency supplied by Mr. Ramacci. Some of the equipment Mr. Ramacci purchased for this purpose was apparently never used. Torres and Baker ultimately produced approximately $610,000 in counterfeit notes on the press at the storefront, of which approximately $260,000 was only printed on one side. Good quality United States Federal Reserve Notes in the denominations of 20's and 100's were produced. It is undisputed that Torres was the skilled printer in the counterfeiting conspiracy, not Mr. Ramacci.

Mr. Ramacci, Torres and Baker later met in Baker's basement and altered with green food dye what they believed to be the unacceptable color of the bills. Torres tried to cut the tinted bills with the paper cutter which Mr. Ramacci had purchased but failed, and resorted to using a utility knife. Leaving Torres and Baker to continue, Mr. Ramacci then left Baker's basement with a small amount of cut bills. Both the completed and uncompleted bills were later stored for safekeeping in Baker's home. Baker now involved his nephew, and the two delivered several uncut sheets to Mr. Ramacci's house at his request.

Baker and his nephew then went to Chicago's Maxwell Street market area, where they were arrested after passing a few bills. At the time of their arrest, Baker had $640 in his possession, his nephew $2,440. Baker then consented to a search of his home by the Secret Service and, as a result of that search, the agents seized an additional $36,480 in cut and $496,000 in uncut currency. The $36,480 in cut currency was hidden separately by Baker's nephew in the house. Baker, who had his own key to Mr. Ramacci's shop, executed a consent to search the shop where the negatives, plates, and a printing blanket, all bearing the images of the counterfeit notes, and an additional $69,100 in counterfeit bills were recovered. Both Baker and Torres agreed to cooperate with the Secret Service.

While the Secret Service agents were at Baker's home, Mr. Ramacci telephoned Baker to say that he was worried because he had not heard from Baker. In reply, Baker said he had located someone who might purchase the stash of counterfeit money. The Secret Service recorded the call. Mr. Ramacci rushed over to Baker's house. Upon his arrival, he was arrested. A consensual search of Mr. Ramacci's car yielded $880 in the counterfeit bills.

## II

## ANALYSIS

### A. *Standard of Review*

■ We review factual findings of the district court under a clearly erroneous standard. *United States v. Atkinson*, 979 F.2d 1219, 1222 (7th Cir.1992). A finding of fact is clearly erroneous if, after reviewing all the evidence, we are left "with the definite and firm conviction that a mistake has been committed." *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). We give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Weaver*, 8 F.3d 1240, 1245 (7th Cir.1993); *United States v. Kelly*, 991 F.2d 1308, 1316 (7th Cir.1993). This court reviews questions of law de novo. *United States v. Boyer*, 931 F.2d 1201, 1204 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991).

### B. *The "Face Value" Question*

■ Mr. Ramacci argues that the district court committed error when it included ap-

proximately $260,000 in partially completed bills, printed on the back only, in its sentencing calculation. Pursuant to U.S.S.G. § 2B5.1(a), the base level for the offense of counterfeiting is 9. If the "face value" of the counterfeit currency exceeds $2,000, U.S.S.G. § 2B5.1(b)(1) directs the district court to apply an upward adjustment from the table at U.S.S.G. § 2F1.1 (Fraud and Deceit). Pursuant to U.S.S.G. § 2F1.1(b)(1)(K), a loss of over $500,000 dictates an upward adjustment of ten levels. Thus, if both the completed and uncompleted bills are to be counted, an adjusted offense level of 19 would apply. If the $260,000 in uncompleted bills were *not* counted as part of the "face value" calculation, the total "face value" of the counterfeit notes would be approximately $350,000. U.S.S.G. § 2F1.1(b)(1)(I) would thus dictate an eight-level upward adjustment, yielding a total offense level of 17.

At the outset, we note that the guideline contains no requirement that the bills in question be complete. We agree with the government that application note 2, which requires that the bill be "falsely made or manufactured in its entirety," does not require that the false instrument be complete, but that it not be a genuine instrument that has been altered. This point is made clear by the last sentence of this application note which directs the court to another section of the guidelines in the case of the alteration of an originally valid instrument.

Another aspect of the structure of the relevant guideline suggests strongly that the counterfeit notes need not be completed in order to be counted for purposes of sentencing. Mr. Ramacci was sentenced under U.S.S.G. § 2B5.1(b)(1). This section, as we have just noted, is cast in terms of the "face value" of the notes; it says nothing about their completion. By contrast, the subsequent subsection, which sets a minimum level of 15 when the manufacture of counterfeit notes is involved, specifies, in the accompanying application note 3, that this minimum is not applicable if the notes are "so obviously counterfeit that they are unlikely to be accepted if subjected to only minimal scrutiny." As the government notes, by implication, U.S.S.G. § 2B5.1(b)(1) would apply even to those bills that are obviously counterfeit.

In *United States v. Lamere*, 980 F.2d 506 (8th Cir.1992), the Eighth Circuit determined that partially completed bills should be counted under U.S.S.G. § 2B5.1. Our colleagues in the Eighth Circuit reasoned that the term "face value" does not require that the counterfeit bills be of "passable" quality. *Lamere*, 980 F.2d at 513. In addition to addressing the structural aspects of the guideline that we have discussed in the preceding paragraphs, the court pointed out that "the legislative history supports the conclusion that the Sentencing Commission did not intend to exempt partially completed bills from the sentencing calculation under § 2B5.1(b)(1)." *Id.* at 513. A proposed application note (Application Note 4) that would have directed the district court to disregard *"discarded defective items"* was never adopted. *Compare* 54 Fed.Reg. 9,132 (1989) (proposed amendments) (emphasis added) *with* 54 Fed.Reg. 21,356 (1989) (adopted amendments). The Eighth Circuit reasoned that the rejection of Application Note 4 evidenced "an intention that the courts should appropriately consider less than perfectly completed counterfeit bills." *Lamere*, 980 F.2d at 513. More recently, the Second Circuit in *United States v. Rodriguez*, 989 F.2d 583, 586 (2d Cir.1993), expressly agreed with the reasoning of the Eighth Circuit and upheld the inclusion of defective counterfeit bills in the sentencing calculation. In that case, the district court had held the defendant liable for a great quantity of defective counterfeit money. The Second Circuit specifically held that ". . . counterfeit currency counted for purposes of Guidelines § 2B5.1(b)(1) need not be of passable quality . . . ." *Id.*

We believe that there is no reason for this circuit to adopt an analysis different from the one already employed by the other circuits that have confronted the question. We believe that the Eighth Circuit's analysis in *Lamere* is a well-reasoned and logical approach to the issue before us. The Second Circuit's application of *Lamere* in *Rodriguez* to partially completed counterfeit bills under U.S.S.G. § 2B5.1(b)(1) appropriately applied that reasoning.

Finally, we note that Mr. Ramacci was sentenced for participating in a conspiracy to

manufacture, to pass, and to possess counterfeit currency. Moreover, the counterfeit bills stored for safekeeping by a co-conspirator were an appropriate measure of the extent of that conspiracy. Accordingly, we conclude that the district court properly applied *Lamere* in determining the "face value" of the counterfeit currency at issue. The partially completed counterfeit bills were correctly included in the sentencing calculation. *Cf. Rodriguez*, 989 F.2d at 586 ("The washed currency may have come off the presses defective or for other reasons may have been headed for the trash heap; however, its production was at least an act committed by Rodriguez that was part of the same course of conduct as the offense of conviction and that occurred during the commission of the offense of conviction.").

A review of U.S.S.G. § 2X1.1 establishes that the guideline applies the base offense level for the substantive offense—here counterfeiting—plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. U.S.S.G. § 2X1.1(a). The "reasonable certainty" analysis of § 2X1.1 returns us to U.S.S.G. § 2B5.1(b)(1), which expressly provides that the punishment for the defendant's participation in the conspiracy should reflect the "face value" of the counterfeit items. Our review of the transcript makes it clear that the district court was on solid ground when it concluded that the entire amount of uncompleted bills was part of the conspiracy.

C. *The "Organizer" Question*

█ Mr. Ramacci also contends that the district court erred when it determined that he ought to receive an enhancement to his sentence on the ground that he was an organizer, leader, manager, or supervisor of the counterfeiting conspiracy. He submits that, because he did not exercise some degree of control over Torres and Baker, the two-level enhancement under U.S.S.G. § 3B1.1(c) was not warranted. In essence, Mr. Ramacci argues that, because his co-conspirators, not he, possessed the requisite printing skill and actually printed the counterfeit bills, he could not have been the "organizer, leader, manager, or supervisor" of the conspiracy.

We have noted that " '[t]he central concern of § 3B1.1 is relative responsibility.' " *United States v. Skinner*, 986 F.2d 1091, 1097 (7th Cir.1993) (quoting *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir.1991)). The district court found that, absent Mr. Ramacci, Torres and Baker would not have become involved in the counterfeiting scheme. The record before us supports the conclusion that Mr. Ramacci recruited Baker and Torres, rented the store, and financed the equipment. Given these facts, we believe Mr. Ramacci may be properly categorized as having organized the conspiracy. Accordingly, the district court properly enhanced Mr. Ramacci's sentence under U.S.S.G. § 3B1.1(c).

### Conclusion

The district court properly held that the entire lot of both completed and partially completed counterfeit bills should be attributed to Mr. Ramacci, and appropriately classified him as an "organizer, leader, manager, or supervisor" of the conspiracy pursuant to U.S.S.G. § 3B1.1(c). Accordingly, the judgment of the district court is affirmed.

AFFIRMED.