*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0065P (6th Cir.)
File Name: 00a0065p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

    *v.*      No. 97-4481

JOSEPH KELLY,
   *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-00171—Sam H. Bell, District Judge.

Submitted: December 8, 1998

Decided and Filed: February 24, 2000

Before: NELSON and DAUGHTREY, Circuit Judges;
SARGUS, District Judge.[*]

―――――――――

[*] The Honorable Edmund A. Sargus, United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ON BRIEF:**   George G. Keith, KEITH, GODWARD, CLARK & FRISBY, Cuyahoga Falls, Ohio, for Appellant. Gary D. Arbeznik, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.  Joseph Kelly, Springfield, Missouri, pro se.

———————————

**OPINION**

———————————

DAVID A. NELSON, Circuit Judge.  This is an appeal from convictions for counterfeiting United States currency, a violation of 18 U.S.C. § 471, and conspiracy to make counterfeit currency with intent to defraud, a violation of 18 U.S.C. § 371.  The defendant contends that his indictment was multiplicitous, that evidence of prior convictions was admitted at trial improperly, and that the evidence against him was insufficient to warrant submission of the case to the jury. The defendant also challenges his sentence, contending that the trial court erred both by calculating the guideline sentence range on the basis of a quantity of fake currency seized before the manufacturing process was complete and by enhancing his guideline offense level for a leadership role he denies having played.  Unpersuaded, we shall affirm both the conviction and the sentence.

I

In the early 1990s the defendant, Joseph Kelly, served time in a federal prison in California on a conviction for counterfeiting.  While at the prison Kelly conducted a class in offset printing – a craft the practice of which got him into prison in the first place.  One of the inmates who attended Kelly's class was a man named Anthony Lolakis.

Kelly and Lolakis allegedly discussed the possibility of establishing a counterfeiting operation in Ohio, Lolakis' home state, after they completed their sentences. Lolakis testified that Kelly wanted to set up operations outside of California, where he said he was well known to the authorities as a counterfeiter. Kelly testified that, on the contrary, he told Lolakis he would not get involved in counterfeiting again.

Be that as it may, the men renewed their acquaintance after their release from prison. Although there is some dispute as to who initiated the contact, it is clear that Lolakis, who was back in Ohio, sent money to Kelly in California for the purchase of ink and a camera. Kelly shipped the supplies to Lolakis and then came to Ohio in person, ostensibly to visit his mother in Cincinnati. In the course of this stay he met Lolakis in Youngstown and helped him buy a printing press. Kelly had brought printing plates, developer, and other supplies with him from California, and he purchased additional supplies in Ohio once the counterfeiting operation was underway.

Kelly left Youngstown at one point to visit his mother, subsequently returning to Youngstown. He then departed for California, apparently, but returned to Youngstown once again, making a total of three visits to Lolakis. During this time Lolakis and Kelly produced $2.6 million in counterfeit bank notes. The fake bills were passed first in Michigan and then in Ohio by other members of the conspiracy.

Unlike his fellow conspirators, Kelly elected to take his chances before a jury. The jury found him guilty of both counterfeiting and conspiracy, as we have seen, and the court sentenced him to imprisonment for 125 months for counterfeiting and 60 months for conspiracy, the latter sentence to run concurrently with the former. Kelly's appeal was originally dismissed because of a faulty notice of appeal, see *United States v. Webb*, 157 F.3d 451 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 2019 (1999), but the appeal has been reinstated in light of our subsequent decision in *Dillon v. United States*, 184 F.3d 556 (6th Cir. 1999).

## II

### A.  Admission of Evidence of Prior Convictions

Kelly filed a pretrial motion in limine to exclude from the government's case in chief any evidence of his previous counterfeiting convictions – three in number – and the conduct underlying those convictions.  The record does not disclose that the district court ever ruled on this motion.

Lolakis testified during the presentation of the government's case that he met Kelly in prison in 1992  and that Kelly had been incarcerated for counterfeiting.  No objection was made to this testimony.  In the absence of a contemporaneous objection we must apply a "plain error" standard of review unless the motion in limine operated to preserve the issue for appeal.  In that event we must apply an "abuse of discretion" standard.  See Rule 103, Fed. R. Evid., and *United States v. Levy*, 904 F.2d 1026, 1029-30 (6th Cir. 1990), *cert. denied,* 498 U.S. 1091 (1991).

Faced with similar circumstances, a panel of this court determined, in an unpublished opinion, that a motion in limine does not preserve evidentiary questions for appeal. We find the panel's reasoning persuasive:

> "As a matter of policy, the objection requirement of Fed.R.Evid. 103 is intended to allow the trial court to fix errors in its decision to admit or exclude evidence on the spot, thus preventing errors that could easily be alleviated without recourse to the appellate courts. A pre-trial motion in limine is not as effective a means of alerting the trial judge to evidentiary problems as a contemporaneous motion at trial. This proposition seems particularly true where, as here, the court did not even rule on the motion in limine. Thus, we find that a motion in limine, especially one that is not ruled upon, is insufficient to preserve an objection to the admission of evidence for appeal." *Burger v. Western Kentucky Navigation, Inc.*, No. 91-5221, 1992 U.S. App. LEXIS 8268, *8 (6th Cir. Apr. 15, 1992).

determination under a "clear error" standard.  See *Stanley*, 23 F.3d 1085.

Although the sentencing guidelines do not specifically define the term "leader," courts are invited to consider, in this connection, such factors as the right to a larger share of the profits, the degree of participation in planning or organizing the activity, the nature of the defendant's participation, the nature and scope of the criminal activity, and the exercise of decision making authority.  See U.S.S.G. § 3B1.1 application note 3.  In the case at bar the record shows that Kelly was to receive a full 25 percent of the profits, while Lolakis was to split the rest with the six men recruited to pass the counterfeit bills.  Kelly was involved in plans for the operation, and he selected and purchased the equipment and supplies used.  He was also responsible for printing the counterfeit currency; it was Kelly's expertise alone that made the operation possible. The fact that Lolakis also took a leadership role does not preclude a leadership adjustment in Kelly's offense level.  See U.S.S.G. § 3B1.1 application note 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy").  We find no clear error in the district court's determination.

**AFFIRMED**.

currency before it can be considered counterfeit. See *United States v. Taftsiou*, 144 F.3d 287, 290 (3d. Cir.), *cert. denied*, 525 U.S. 899 (1998), and cases cited therein. These cases deal with the substantive crime of counterfeiting, however, and not with the sentencing guidelines' rather expansive instructions on what sort of "counterfeit" currency should be counted in calculating a convicted counterfeiter's offense level.

As used in the relevant guideline, "'[c]ounterfeit' . . . means an instrument that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety [as opposed to genuine instruments that have merely been altered]." U.S.S.G. § 2B5.1 application note 3. We have not had occasion to construe this definition in a published opinion, but several of our sister circuits have construed it to require something less than bills of "passable" quality. See *United States v. Webster*, 108 F.3d 1156, 1158 (9th Cir. 1997). At least two circuits have found that bills printed on only one side "purported to be genuine." See *United States v. Ramacci*, 15 F.3d 75, 78 (7th Cir. 1994), and *United States v. Lamere*, 980 F.2d 506, 509, 513-14 (8th Cir. 1992). The history of § 2B5.1(b)(1) supports this interpretation; a proposed amendment that would have excluded defective items from consideration was rejected. See *Webster*, 108 F.3d at 1158, *Ramacci*, 15 F.3d at 78, and *Lamere*, 980 F.2d at 512. We agree with the view set forth in the cited cases.

Kelly's unfinished counterfeit notes lacked only the Treasury seal, Federal Reserve seal, and Federal Reserve numbers. The bills were near enough to completion, we believe, to "purport to be genuine." The district court did not err in counting the entire $2.6 million.

### E.  Adjustment for Leadership Role

Kelly's final argument is that his guideline offense level should not have been adjusted under U.S.S.G. § 3B1.1(c) on the strength of his supposed "leadership role" in the conspiracy. We review the district court's leadership role

Decisions from other circuits to the same effect include *Petty v. Ideco, Div. of Dresser Indus., Inc.*, 761 F.2d 1146, 1150 (5th Cir.1985) ("[A] party whose motion in limine is overruled must renew his objection when the error he sought to prevent is about to occur at trial"), and *Adams v. Fuqua Indus.*, 820 F.2d 271, 274 (8th Cir.1987) (noting in dictum that "a motion in limine does not ordinarily preserve error [in evidentiary rulings] for appellate review. . ."). But see *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 324 (3rd Cir.1985), and *Thronson v. Meisels*, 800 F.2d 136, 142 (7th Cir.1986).

The district court's allowance of Lolakis' unobjected-to testimony regarding Kelly's prior conviction does not, we believe, constitute plain error. The information was integral to the facts underlying the indictment and may well have been indicative of Kelly's specific intent to defraud, an element of the charged crimes. See, *e.g., United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir.), *cert. denied*, 488 U.S. 993 (1988) (allowing evidence of prior acceptance of bribes to show intent to accept drug protection money). Were it not for Fed. R. Evid. 403, therefore, the evidence would almost certainly have been admissible under Rule 404(b). See *United States v. Crachy*, 800 F.2d 83, 87 (6th Cir. 1986), *cert. denied*, 479 U.S.1042 (1987), and *United States v. Hamilton*, 684 F.2d 380, 384 (6th Cir.), *cert. denied*, 459 U.S. 976 (1982). Rule 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice; viewing the record as a whole, we cannot say the district court was clearly required to find that any such danger substantially outweighed the probative value of the evidence here. See *United States v. Khan*, 969 F.2d 218, 222 (6th Cir. 1992).

### B.  Sufficiency of the Evidence

"The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant. . . . 'The relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Maxwell*, 160 F.3d 1071, 1077 (6th Cir. 1998) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979) (emphasis in original)).

Kelly contends that the government's evidence was insufficient because the co-conspirators who testified against him were, in light of their confessed crimes, so unreliable that no rational trier of fact could have believed what they said. But determining the credibility of witnesses is a task for the jury, not this court. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993), *cert. denied*, 510 U.S. 1130 (1994). The jury was obviously entitled to accept the testimony of Kelly's several co-conspirators and reject Kelly's own testimony. Other witnesses identified Kelly as the purchaser of the printing press and supplies, moreover, and his fingerprints were retrieved from several of the plates used in the press. The evidence of Kelly's guilt was more than sufficient to support a conviction.

### C. Multiplicity of the Indictment

Kelly contends that Counts I and II of the indictment against him were multiplicitous because the overt acts of the conspiracy recited in Count I were the same acts that formed the basis for the substantive counterfeiting crime alleged in Count II. We find no merit in this argument.

A defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other. See *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In Kelly's case the conspiracy charge required proof of an agreement between two or more persons – an element not required to be shown in proving the substantive counterfeiting charge – while the latter charge, unlike the former, required proof that the defendant actually manufactured counterfeit notes. The Supreme Court has explicitly stated that "it is not material that overt acts charged in the conspiracy count[] were

also charged and proved as substantive offenses." *Pinkerton v. United States*, 328 U.S. 640, 644 (1946).

Although it is well established that a conspiracy charge can legitimately be added to a substantive charge, there are certain exceptions to this general rule:

"One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. . . . Another is where the definition of the substantive offense excludes from punishment for conspiracy one who voluntarily participates in another's crime." *Id.* at 643 (citations omitted).

The charges against Kelly did not come within any of the exceptions to the rule.

Kelly further asserts, in connection with his multiplicity argument, that the language of the conspiracy charge shifted the burden of proof to him and that the district court should have made a finding prior to trial as to when the alleged conspiracy began. These assertions are without merit.

### D. Calculation of Sentence Based on Partially-Manufactured Counterfeit Currency

In calculating Kelly's guideline sentence range, the district court used the full $2.6 million in counterfeit currency that Kelly and Lolakis produced. When Kelly left Ohio for the last time, however, the manufacturing process was incomplete as to a portion of this total. Kelly argues that only the bogus $15,000 introduced at trial should be counted – an argument acceptance of which would mean a 3-level increase in his offense level as opposed to a 13-level increase. See U.S.S.G. § 2F1.1. Because the argument raises an issue of guideline interpretation, our review is de novo. See *United States v. Stanley*, 23 F.3d 1084, 1085 (6th Cir. 1994).

Kelly draws our attention to a number of cases holding that fake currency must bear an adequate resemblance to real