**UNITED STATES of America,**
Plaintiff–Appellee,

v.

**Mark HEDDEN, Defendant–Appellant.**

No. 00–1492.

United States Court of Appeals,
Sixth Circuit.

April 3, 2001.

Before KENNEDY and SUHRHEINRICH, Circuit Judges; GAUGHAN, District Judge *.

KENNEDY, Circuit Judge.

Defendant Mark Hedden was convicted of two counts of embezzling from an Indian tribal organization in violation of 18 U.S.C. §§ 666 and 1163. Hedden appeals the district court's denial of his motion for acquittal and its decision to enhance his sentence. On appeal, he argues (1) the government failed to provide sufficient evidence to prove beyond a reasonable doubt that he embezzled from the tribe and (2) the evidence does not support the district court's enhancement of his sentence.

Viewing the evidence in a light most favorable to the government, we conclude a reasonable juror could have found beyond a reasonable doubt that Hedden was guilty. . The evidence also supports the district court's decision to enhance Hedden's sentence. Accordingly, we affirm the district court's denial of Hedden's motion for acquittal and reduction of sentence.

I.

Hedden, along with Alan Mead, was indicted by a grand jury for conspiring to convert and converting funds from the Indian tribal organization, Grand Traverse Band of Ottawa and Chippewa Indians (GTB or the Tribe). The indictment charged Hedden with three acts of embezzlement, one of which allegedly involved Mead, and conspiring with Mead to embezzle. Both men pleaded not guilty and proceeded to trial.

At trial, the jury heard the following evidence. GTB is a federally recognized Indian Tribe, and received $10,000 a year in federal funds for the period of October 1,1995 through September 31, 1996. In April of 1995, GTB hired Hedden as its Director of Division V. As such, he was responsible for non-gaming economic development for the Tribe, including the management of several trust and mutual funds. To that end, Hedden's responsibility was to introduce proposals for new business ventures.

Unsatisfied, with the proposals Hedden was making and lacking trust in him, the Tribal Council notified Hedden on December 4, 1995, that he would be terminated effective December 18th. *See* Joint Appendix (J.A.) at 245. Soon after Hedden's termination, GTB eliminated Division V and conducted an audit of its expenditures. The audit revealed several troubling expenditures during the last two week's of Hedden's employment.

First, the audit uncovered funds payed to Alan Mead pursuant to a contract entered into by Hedden on behalf of GTB with Alan Mead to perform "consulting and investigative" services. According to Mead and Hedden, Mead was hired to

* Honorable Patricia A. Gaughan, United States District Judge for the Northern District of Ohio, sitting by designation.

investigate and analyze investment opportunities for GTB. The consulting contract documenting this agreement was dated December 1st and was to run from then until September 5, 1996. The contract provided that GTB was to pay Mead at a rate of fifty dollars per hour, with the total compensation not to exceed $4,000 for the services he provided. *See* J.A. at 120–22.[1]

GTB received a bill on December 8th, requesting payment of $4,000 for services rendered. *See* J.A. at 123. Hedden testified that he created and submitted the bill, though it appears that Mr. Mead was aware of Hedden's actions. *See* J.A. at 319–21, 402–04. Special Agent Paul Brasmer of the Federal Bureau of Investigation, who investigated the transactions, testified that during an interview with Mead, Mead indicated that the bill was for completed work, work that was in the process of being completed, and future work. *See* J.A. at 125. At the time of the interview, Mead could not point to any documentation of work he produced for GTB. In his testimony, Mead claims to have later faxed Agent Brasmer copies of two reports, totaling five pages, he had given to GTB. *See* J.A. at 440. It appears from the record that Mead had written those reports in connection with another agreement with GTB and had previously been compensated for that work.

Upon receiving the bill, GTB issued a check payable to Mead on December 12, 1995. Mead, however, did not receive the check until sometime in late January or early February. He testified he first received a form 1099 from GTB reporting that it payed him $4,000 for services. When he received the form, Mead contacted Hedden. According to Hedden, in late January, he discovered that he had somehow placed Mead's check in his files. Upon making this discovery, Hedden mailed the check to Mead. *See* J.A. 408–09. On February 5, 1996, Mead cashed the check. Just one day earlier, Mead's wife had written a check to Hedden for $2,000. Agent Brasmer testified that when asked about the payment to Hedden during the interview, Mead responded that Hedden had approached him and asked for the money because Hedden had been fired from GTB. See J.A. at 126–27. And when asked whether the payment to Hedden was a kick back, Mead admitted, " 'Yes, in fact, it was.' " J.A. at 127. At trial, however, Mead testified that the $2,000 was for consulting work Hedden performed for him and disputed admitting that the payment was a kickback. J.A. at 405. Hedden, likewise testified that the $2,000 was for consulting services, which he claims he performed in December of 1995. *See* J.A. at 264, 313. He admitted, however, that he discussed payment for the services when he spoke with Mead about the $4,000 check.

The second transaction the audit revealed related to payments received by a Hedden corporation, Rhino Excavation & Construction Consulting Services, for excavation and septic work done by Johnson Excavation, Inc., on a four-plex being built by GTB. Hedden, on behalf of GTB, had contracted with Johnson Excavation to perform the work in the summer of 1995 at a price of $10,698.46. Johnson was to complete the work in three phases. First, it was to "work off the mono slab for the four-plex." The second phase involved placing the septic tanks. And third, backfilling after the placement of the tanks. J.A. at 168–69. Hedden, however, characterizes the project as involving two portions. One, everything other than the septic work, and two, the septic work. Once Johnson Excavation completed the first

---

1. It should be noted that Mead had previously analyzed two companies, Titan Technologies and Adherent Technologies, for GTB and had been compensated $1,600 for those services.

phase of the project in November of 1995, it submitted an invoice for $3,600 and was promptly paid. Hedden testified he had no knowledge that Johnson had completed this work or been paid for it. *See* J.A. at 290. However, it appears from the record that Hedden approved the payment. *See* J.A. at 287–88.

In early December, before Johnson Excavation had begun work on the second phase, Hedden contacted its owner, Mr. Victor Johnson, and requested that he submit a bill for the yet-to-be completed work. Johnson testified Hedden informed him that the Tribe's fiscal year ended on December 31st and the project needed to be paid from currently allotted funds. *See* J.A. at 169–70. In truth the Tribe's fiscal year runs from September. *See* J.A. at 90. Johnson did as Hedden requested, submitting a bill for $5,035.96. On December 15, 1995, Hedden approved a payment to Johnson Excavation, marking the approval "Immediate Pay."

At the same time Hedden was prematurely paying Johnson, he was paying his own company, Rhino Construction for the same work. On a bid sheet dated December 1, 1995, Hedden submitted a bid for Rhino Construction for the same excavation work Johnson performed. Hedden claims that Joseph Raphael, the Tribe's Chairman, at the time gave him permission to contract with GTB for the work. Shortly after submitting the bid, on December 10, 1995, Hedden filled out and approved a request for payment of $8,950 to Rhino Construction for completion of the excavation work. Five days later, at the same time he submitted Johnson's payment approval, he submitted Rhino's as well marking it too "Immediate Pay." The Tribe issued both checks. Subsequent to receiving his check, Hedden payed Johnson $2,062.50 from his personal account, thereby bringing the total amount Johnson was paid up to the $10,698.46 of his bid. Hedden testified that it was on that date, December 27, 1995, that he first learned of the $3,600.00 initial payment to Johnson. The total payments relating to the excavation job, however, were $6,887.50 over the determined cost of the project.

Once the investigation into his activities had begun, Hedden attempted to retrieve the $3,600 originally paid to Johnson. He wrote Johnson a letter claiming that there had been some confusion regarding the nature of Johnson Excavation's relationship with GTB. Rhino Construction, the letter explained, was acting as Johnson Excavation's general contractor on the excavation portion of the project. Consequently, any payments relating to the excavation, should have been made to Rhino Construction. Accordingly, Hedden requested that Johnson return the $3,600 to GTB and he would issue Johnson a check for that amount. Suspecting things were not as they should be, Johnson instead contacted the Tribe, which told him not to return the money. Johnson also testified that he had not heard of Rhino Construction prior to the letter he received from Hedden and that he did not believe he was working as a subcontractor for Hedden.

Hedden, on the other hand, testified that overpayment was a mixup and disputed Johnson's version of the facts. He claimed he was not aware that Johnson had been paid the original $3,600 for excavation work until December 27, 1995. Further, he maintained, it was understood that Johnson was working as his subcontractor on the excavation portion of the project and was working directly for GTB on the septic portion.

At the close of the trial, Hedden moved pursuant to Fed. R.Crim. Pro. 29(a) to have count four of the indictment dismissed; the motion appears to have been oral and Hedden does not mention the other three counts. Finding that the gov-

ernment had failed to prove its case as to this count, the court granted Hedden's motion.

The jury acquitted Mead of both counts. However, it convicted Hedden of violating § 1163 for embezzling funds in relation to the Mead transaction and of violating § 666(a)(1)(A) for embezzling over $5,000 in the Johnson Excavation transaction. At that point, Hedden moved under Fed. R.Crim. Pro 29(c) and 33 for an acquittal on the two charges of which he was convicted and, in the alternative, a new trial. The district court denied both motions.

Moving to the sentencing proceeding, the court heard testimony from two government witnesses who contradicted portions of Hedden's trial testimony. Joseph Raphael, Chairman of GTB in 1995, testified that, contrary to Hedden's testimony, he never gave Hedden permission to enter into a contract with GTB to perform the excavation work. Ardith Chambers, who succeeded Hedden as Director of Division V, testified that, contrary to Hedden's testimony, he never contacted her about returning the money Rhino Construction received. Based in part on that testimony, the court enhanced Hedden's base level by six points and sentenced him to fifteen months imprisonment.

Hedden appeals both the district court's denial of his Rule 29(c) motion and his sentence.

## II.

On appeal, Hedden argues there was insufficient evidence to convict him and to enhance his sentence. Accordingly, he concludes the district court should have granted his Rule 29(c) motion and in the alternative should not have enhanced his sentence.

## A.

"The relevant inquiry in reviewing claims of insufficient evidence is 'whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 207, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *see also United States v. Latouf,* 132 F.3d 320, 325–26 (6th Cir.1997).

■ Hedden argues he meets this standard on both counts. As to count two, embezzlement relating to the money received from Mead in violation of 18 U.S.C. § 1163, he appears to argue that because Mead was acquitted, he must be too. If Mead was entitled to the $4,000, he reasons, then he could not have embezzled the $4,000. As to count five, embezzlement of funds related to the excavation project, he argues that he was entitled to a portion of the money because he was hired by the Tribe as the general contractor for the excavation work. As such, he appears to claim he hired Johnson Excavation as his subcontractor for the excavation portion of the project. Because he believed he was the general contractor on the excavation portion, he believed the Tribe would pay him for the excavation portion and from that he would then pay Johnson. Hence, his submission and approval of a bill from Rhino Construction for $8,950. Because he attempted to retrieve the $3,600 from Johnson, Hedden argues, the actual amount that was improperly taken from GTB is $3,287.50. That amount puts him below the statutory threshold of $5,000 necessary to be charged under 18 U.S.C. § 666(a)(1)(A). Both arguments fail.

Beginning with the embezzlement charge related to the Mead transaction, we conclude there was sufficient evidence for a rational juror to find beyond a reasonable doubt that Hedden converted the money. Section 1163 has two elements:

(1) the person charged must have stolen, embezzled, or knowingly converted to his own use or to another's money or property of (2) an Indian tribal organization. Only the first element is in dispute here.

As Mead admitted during his interview with Agent Brasmer, he viewed the $2,000 he paid Hedden as a kickback. That admission was supported by the fact Mead cashed the check one day after Mrs. Mead had written Hedden a check for $2,000, leaving the impression that Hedden was not willing to give Mead the money until he had received a kickback. If the jury adopted this rationale, it could have viewed Mead as entitled to $2,000 of the money for services he had performed but seen Hedden as not entitled to any money. We do not think the fact that the jury acquitted Mead poses a problem. The jury could have further determined that while Mead may have believed he was entitled to the $4,000, Hedden believed he was not and gave Mead the check only once Hedden was assured he would receive $2,000. Thus, Hedden would have used the $4,000 in order to obtain $2,000.

Moving on to the second count on which Hedden was convicted, we find no problem with the jury's determination. Section 666(a)(1)(A) has three elements: (1) the person charged must be an agent of a tribe, (2) must embezzle $5,000 from the tribe, and (3) the tribe must receive $10,000 under a Federal Program. Only the second element is in dispute.

The jury was entitled to reject Hedden's version of the facts in favor of Johnson's version. See *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir.2000). If the jury chose to believe Johnson's version of the facts—that he was not working for Rhino Construction—then Hedden would have clearly taken $6,887.50 to which he was not entitled. That amount is over the $5,000 threshold required for a conviction under § 666(a)(1)(A). Hedden's argument that

he was intending to return $3,600, thereby lowering the amount he converted to less than the statutory threshold fails for much the same reason. The jury was entitled to reject Hedden's version of the facts. See *id.* Despite his claims at trial, he appears to have been aware of the $3,600 payment to Johnson. Moreover, it appears he only took efforts to return the money after the investigation into his conduct had begun.

### B.

We review a district court's factual findings in relation to an application of the Sentencing Guidelines for clear error. See *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir.2000). We review a district court's legal conclusions de novo. See *id.*

Using the 1998 version of the Sentencing Guidelines, the court set the base level at four. Pursuant to § 2B1.1(b)(1)(E) the court added four points because the total loss it found was $8,887.50—$2,000 relating to the Mead transaction plus $6,887.5 relating to the Johnson transaction. It then enhanced Hedden's base level offense by six points. It found that Hedden had engaged in more than minimal planning and consequently added two points pursuant to § 2B1.1(b)(4)(A). It increased the level by another two points pursuant to § 3B1.3 for abuse of a position of trust. And finally, the court added an additional two points pursuant to § 3C1.1 for obstruction of justice for Hedden's false testimony. That brought Hedden's total points to fourteen. See J.A. at 519. Based on that level, the court sentenced Hedden to fifteen months imprisonment on each count, to be served concurrently; two years supervised release on each count, to be served concurrently; and ordered him to pay $8,877.50 in restitution, $2,000 in fines, and a $100.00 assessment. See J.A. at 24–25.

Hedden argues that the three sentence enhancements were inappropriate. As to

the enhancement for more than minimal planning, Hedden claims that there was no evidence that he created any additional documents as the district court had found. Relying on *United States v. Ragland,* 72 F.3d 500, 502 (6th Cir.1996), he claims that the position of significant trust enhancement is incorrect because other employees could have submitted the documents that Hedden submitted and therefore he was not acting as a fiduciary or trustee. Finally, he believes that the enhancement for obstruction of justice for false testimony was error because, "[a] careful review of the [his] testimony ... could easily lead to a conclusion that he was mistaken on some issues, but that he believed what he was saying." Appellant's Br. at 23. We are not persuaded.

■ The notes to § 2B1.1 cross-reference § 1B1.1, the application notes for which deem "more than minimal planning" to be present in the case of embezzlement when the defendant "creat[es] purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered." § 1B1.1 app. n. 1(f). The district court found that Hedden created Rhino and false invoices relating to the project in order to avoid being discovered. *See* J.A. at 498. There is evidence in the record to support that finding. Rhino came into existence a short time prior to Hedden approving its contract with GTB. Johnson, moreover, testified that he had never heard of Rhino and did not believe he was working as Rhino's subcontractor. Additionally, Hedden created several work orders in order to secure payments for Rhino. If Rhino was not the general contractor on the project, as the district court found, then all the work orders are false.

■ In attempting to persuade us that he was not in a position of trust, Hedden misrepresents the language in *Ragland.* Contrary to his assertions, *Ragland* did not hold that a position of trust as used in

§ 3B1.3 means only that akin to a trustee or fiduciary. Rather, the court stated, "as used in the guideline, 'position of public or private trust' is a term of art, *appropriating some of the aspects of the legal concept of trustee or fiduciary." Ragland,* 72 F.3d at 503 (emphasis added). We went on to state, just as the application notes to § 3B1.3 state, that the determination of whether a defendant was in a position of trust turns on the degree of discretion the defendant. *See id.* That is, whether the person has "substantial discretionary judgment that is ordinarily given considerable deference." § 3B1.3 app n. 1. The district court found that Hedden had substantial discretion in contracting with respect to the excavating project. Again, there is sufficient evidence that the court's determination was not clearly erroneous. Hedden appears to have been given great latitude in whom he selected for the excavation project. It was that discretion that allowed him to select his own company and consequently charge GTB twice for the same work.

■ Finally, the district court's finding that Hedden attempted to obstruct justice is not clearly erroneous. Section 3C1.1's application note 4 lists committing perjury as one form of obstruction of justice. The district court found that Hedden's assertion that he was operating as Johnson's general contractor was false, that finding is well supported in the record.

### III.

For the foregoing reasons, we affirm the district court's judgment denying the motion for acquittal and its decision to enhance Hedden's sentence.