NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 12a0476n.06

No. 10-5608

**FILED**

*May 04, 2012*

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | KENTUCKY |
| | ) | |
| LUCINDA D. CALHOUN, | ) | **O P I N I O N** |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

**BEFORE: BATCHELDER, Chief Judge; NORRIS and STRANCH, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Defendant Lucinda Calhoun appeals from a jury verdict

that found her guilty of five counts related to the robbery of a bank in Owensboro, Kentucky. While

defendant did not participate in the robbery, the jury convicted her of aiding and abetting it. The

jury also returned guilty verdicts on four counts related to defendant's attempts to obstruct justice

in the wake of the robbery.

She raises two issues on appeal. First, she contends that the district court erred when it

permitted the introduction of evidence that she encouraged two other individuals to pass bad checks

and then share the proceeds with her and her co-defendant husband, John Calhoun. The government

had earlier filed a notice pursuant to Fed. R. Evid. 404(b) to introduce this "prior bad acts" material

1

to show "knowledge and intent in receiving the stolen proceeds from the bank robbery." Second, she takes issue with the district court's failure to consider her health problems and community involvement when imposing sentence. Finding that neither of these claims has merit, we affirm the judgment.

## I.

During her marriage to John Calhoun, defendant had intimate relationships with two women. The first was Melody Johnson whom defendant met at church in 2000. By 2004, their relationship became sexual. That same year, Johnson cashed a "cold" check at a local grocery store. According to her trial testimony, Johnson wrote this check at the request of defendant who needed money to buy her children Christmas presents. Johnson and defendant both knew that there were insufficient funds to cover the check. Thereafter, both John and Lucinda Calhoun asked her to write additional bad checks to buy things which she then gave to the Calhouns. As a result, Johnson was prosecuted for passing bad checks and spent 22 months incarcerated.

When she was released, she worked part-time in the Calhouns' car detailing business. She also received partial social security disability payments for a medical problem. In 2006, she moved to Evansville, Indiana. Her relationship with defendant continued, however.

The second woman in the story is Tracy Crockett. According to her trial testimony, she, too, is disabled and received social security benefits. She met defendant in the 1990s when each had children in pre-school. They saw each other casually at church for the next decade. Then, in March 2007, defendant asked Crockett to make a minor repair to her car. That same week they began a

sexual relationship. According to Crockett, "I fell in love with her. I was very loving, caring, wanted to take care of her." Like Johnson before her, Crockett began working at the Calhouns' detailing shop. Also like Johnson, Crockett ran into legal trouble for writing bad checks. According to her trial testimony, she needed help managing her checkbook and defendant offered to balance it. Both realized that the account had insufficient funds to cover certain checks that Crockett wrote, but defendant promised she would deposit money to the account. Crockett purchased tires for a car owned by the Calhouns, paid to have their air conditioning repaired, and bought cameras for defendant. As a result of these bad checks, Crockett was arrested and spent four days in jail before her roommate bailed her out.

While in jail, she heard about a bank robbery. After she was released, she and defendant talked about it and Crockett confessed that she had planned a bank robbery five years earlier but then abandoned the plan. A day or two later, on October 12, 2007, defendant met Crockett at the detailing shop and the two went to Crockett's house. While there, defendant gave her a bag containing a BB gun, a wig, and some sunglasses. Defendant told Crockett that she wanted her to rob a bank. They drove to a used car lot and obtained a car by asking to test drive it. They parked in a shopping center lot about a block and a half away from the bank that defendant wanted Crockett to rob. Crockett put on the wig and sunglasses, hid the BB gun pistol in her waistband, and headed toward the bank. Once inside, however, she got cold feet and left.

The next day, a Saturday, Crockett was with the Calhouns when "Cindy said something to John about whatever I promised her I would do, and John said to me that whatever I promised her

I best do what I promised." She felt that John Calhoun knew about the planned robbery. The same day she and defendant scouted several other banks, including two branches of the South Central Bank. At some point, defendant suggested that Crockett pawn her guitar in order to buy a fake mustache, which she did. She returned home and put on her bank-robbing gear: blue jeans, a gray t-shirt with Winnie the Pooh on it, a jacket, the fake mustache, a cap, and sunglasses. The Calhouns drove to her house and told her that she looked "like a guy." Both knew what was afoot. Defendant told Crockett that she wanted to be close and watch it happen. However, the Calhouns went to the wrong South Central Bank branch.

Meanwhile, a disguised Crockett entered the other South Central branch, showed a teller her BB-gun pistol, and ordered her to put money in a backpack. The teller included ten $20 "bait bills" along with money from the till. After the robbery, Crockett made her way to the Calhouns' detailing shop. From there, she drove with them to their home. After arriving, she changed and the three of them dumped the money on the floor and began counting. She had stolen about $13,000, which she and defendant split. Crockett then gave defendant an extra $2,000 to give to defendant's daughters. Both Crockett and defendant also handed John Calhoun $500.

Owensboro police detective Michael Walker testified that his department reviewed video from the bank and distributed images of the robber to the local media. In response, they received several leads, which included callers who believed the robber was Tracy Boone (Crockett's maiden name). Further investigation led them to Crockett's address and to her rommate, David Middleton. Although Middleton was unaware of the robbery, he had a connection with another detective, Ed

4

Krahwinkel, who was working on a theft that Middleton had reported. Krahwinkel asked Middleton to meet with him at the Calhouns' detailing shop. Middleton arrived with Crockett. Other officers and Detective Walker were all summoned and they spoke with both Crockett and defendant. When interviewed separately, Crockett admitted to the robbery and told Walker that "it was all me." She eventually implicated defendant, however, as her trial testimony makes clear.

The next day, police executed a search warrant for the Calhoun's home, located the backpack used during the robbery and defendant's purse which contained over $7,000. The officers also identified the bait bills from the bank.

In 2008, the Calhouns and Crockett were indicted. Crockett was charged with bank robbery, 18 U.S.C. § 2113(a); the Calhouns were charged with receiving funds from the robbery, 18 U.S.C. § 2113(c); and Lucinda Calhoun was charged with making a false material statement, to wit, that the money found in her purse "was hers and that she had received it in March of 2007." Prior to trial, Crockett pleaded guilty. The trial of the Calhouns occurred later that month and resulted in a mistrial.

A superseding indictment charged defendant with aiding and abetting the bank robbery, making false material statements, and obstructing justice (three counts). It also included a count charging both Calhouns with receiving proceeds from the bank robbery. The jury acquitted John Calhoun on the sole count against him. By contrast it convicted defendant on all counts with one exception: it acquitted her of receiving proceeds from the bank robbery because it found her guilty of the substantive count.

5

A word about the obstruction of justice counts, which the district court cited during sentencing as a reason for staying within the guidelines range. The first count alleged that defendant "made a false material statement" in a matter within the jurisdiction of the FBI in violation of 18 U.S.C. § 1001 when she told an officer that the money in her purse was hers and had been obtained in March 2007. The other three counts involved violations of 18 U.S.C. § 1512(b), which prohibits witness tampering and hindering a law enforcement officer in his or her ability to report a federal crime. The first of these counts charged defendant with making a false report to an Owensboro detective "concerning stolen currency from a bank". The remaining two counts involve defendant's attempts to induce Melody Johnson to make a false report about the bank robbery to the Owensboro police and to avoid testifying at defendant's trial by evading legal process.

The pre-sentence report ("PSR") calculated defendant's guidelines range between 78 and 97 months of incarceration. No objections to the PSR were filed by defense counsel. The court imposed a sentence of 78 months. For her part, Crockett received a sentence of 29 months.

**II.**

**1.  Rule 404(b) Evidence**

Federal Rule of Evidence 404(b) protects defendants against the use of evidence respecting past crimes, wrongs, or acts in order to prove character. However, such evidence may be admissible for another purpose, such as proving motive, opportunity, plan, knowledge, identity, abuse of mistake, or lack of accident.

6

In determining whether Rule 404(b) evidence is admissible, the district court takes the following approach:

> *First,* the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second,* if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third,* if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003). As a recent published opinion from this circuit highlights, the standard of review that we apply to the district court's decision is open to debate. *United States v. Clay*, 667 F.3d 689 (6th Cir. 2012). As the dissent in *Clay* points out, we have often applied an abuse of discretion standard. *Id.* at 703 (collecting cases). However, the majority in *Clay* adopts an approach that other panels have taken: 1) we review for clear error whether the other act occurred; 2) we review de novo the legal determination that the other act was admissible for a permissible purpose under Rule 404(b); and 3) we review for an abuse of discretion the district court's balancing of the probative value of the act against the potential for undue prejudice. *Id*. at 693. Given that *Clay* is our most recent published opinion on the point, we will follow its approach but note that we would have reached the same result under an abuse of discretion standard.

The government contends that the district court never ruled on defendant's motion in limine seeking the exclusion of the Rule 404(b) evidence and, when that evidence was introduced during trial, defense counsel did not object. This court has held that merely filing a motion in limine to

7

exclude evidence does not preserve the issue for appeal unless counsel also objects to the evidence at the time that it was introduced. *United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000). Under these circumstances, our review is for plain error. Defense counsel did not submit a reply brief and thus has not disputed the government's position. We note, however, that the district court docket contains an entry dated February 1, 2010 that indicates that the motion in limine was ruled on at trial. While we have been unable to locate the district court's ruling in our review of the transcript, we prefer to err on the side of caution and thus will assume for purposes of this opinion that the issue has been preserved.

Defendant acknowledges that the first of the three inquiries required of the district court when evaluating the admission of Rule 404(b) evidence has been satisfied. The government introduced sufficient testimony to "support a finding by the jury that the defendant committed the similar act." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). As already mentioned, the Rule 404(b) evidence the government sought to use was defendant's involvement in the "bad checks" written by Johnson and Crockett.

However, defendant disputes that this evidence was introduced for a proper purpose. In its response to her motion in limine, the government took this position: "As to the charge of knowingly receiving stolen proceeds against both parties, the evidence of Lucinda and John Calhoun knowingly receiving stolen proceeds from Crockett's and Johnson's theft by deception through checks is probative of the Calhoun[s'] knowledge and intent." It also argued that the evidence "is probative

of Lucinda Calhoun's opportunity to induce Crockett to rob a bank and to induce Johnson to lie for her and hide from [the] authorities."

Defendant takes the position that the other acts evidence is impermissible because the other evidence introduced during trial with respect to her opportunity, knowledge, and intent was sufficiently strong to make the bad check evidence unnecessary. "Miss Calhoun never claimed a lack of opportunity to plan the bank robbery with Miss Crockett or a lack of opportunity to plan the obstructive conduct with Miss Johnson, just that it didn't occur." Brief at 19. "In the case at bar, if Miss Calhoun asked Miss Johnson to lie and implicate her co defendant, intent can be inferred. Likewise, if she helped Miss Crockett rob a bank, intent can also be inferred. Thus intent was not an issue." Brief at 22. "Miss Crockett testified that Miss Calhoun went with her to scout the bank to be robbed and they counted the proceeds and distributed them together. . . . Thus there can be no real issue as to knowledge in this case." Brief at 22. In short, defendant seems to be arguing less that the Rule 404(b) evidence was offered for an impermissible use than that it was unnecessary and simply constituted "piling on."

Piling on, of course, implicates the third inquiry for the district court: whether the probative value of the evidence outweighed its potential for prejudice. Defendant relies on *Old Chief v. United States*, 519 U.S. 172, 180 (1997), for the proposition that "unfair prejudice" as defined in the Advisory Committee Notes to Fed. R. Evid. 403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." While the district court appears not to have conducted a Rule 403 balancing analysis during trial, our independent review

9

of the record convinces us that no error occurred in the admission of the "bad check" evidence. First, as defendant herself impliedly concedes, it was admissible for a proper purpose. With respect to the "unfair prejudice" inquiry, we note that all evidence introduced by the prosecution carries with it a degree of prejudice inasmuch as it is offered to prove a point disputed by the defendant. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993). The question is whether it is unfairly prejudicial. Under the applicable abuse of discretion standard, we give "'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Culbertson*, 364 F. App'x 998, 999 (6th Cir. 2010) (quoting *United States v. Wheaton,* 517 F.3d 350, 364 (6th Cir. 2008)). In this case, we find no abuse of discretion. The evidence of defendant's involvement in the bank robbery was abundant and, while the "bad checks" evidence may not have been necessary to establish guilt, neither was it so prejudicial that it could have led to a confusion of the issues or otherwise misled the jury. Fed. R. Evid. 403.

## 2. The Sentence

Defense counsel did not file objections to the PSR, which calculated a guidelines range of between 78 and 97 months. At sentencing the government asked the district court to impose a sentence at the high end of the range. It focused upon defendant's "long-standing pattern of manipulating vulnerable women." More significantly, it stressed defendant's obstruction of justice: specifically, she instructed Melody Johnson to lie to the police.

Defense counsel responded by citing defendant's health problems, lack of a criminal record, and her "history of community involvement, especially to the churches." He also observed that

10

defendant did not actually rob the bank and Ms. Crockett, who did, received a sentence of only 29 months of imprisonment. In his view, that discrepancy "offends the senses when it comes to consideration of what is fair in this case." He therefore requested that the court impose a sentence "at the lowest end [of the range], if not a departure below."

The district court obliged and imposed a sentence of 78 months of incarceration. In doing so, it observed that it had received numerous letters "from people that support you, people that I respect, people who say that you aren't the person that I came to know during these two trials." Nonetheless, the court found that, while it was "bothered" by the discrepancy in the sentences received by Crockett and the one it was about to impose, defendant's lack of acceptance of responsibility and the fact that she maintained her innocence throughout the proceedings cut the other way:

> You put the United States to the task of two trials. You received for some reason the largest portion of the stolen bank proceeds that were found in your purse, then you made up the story with Melody Johnson. . . .
>
> It was a bizarre story. . . . You obstructed justice. You then tampered with witnesses. You manipulated people for your own purposes. So when I look at the sentencing and I try to compare it with what Tracy Crockett got . . . . I don't think it's unreasonable, because of the fact that you never cooperated, or you never accepted responsibility, [and] you never have shown any remorse . . . .
>
> I'm not going to go along with the high end [of the range]. I don't think I need to sentence you to 97 months to punish you. But I think a low end sentence, the guideline range is about right.

(Doc. 203 at 9-10).

We have repeatedly noted that a within-guidelines sentence enjoys a rebuttable presumption of reasonableness. *See, e.g., United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006). However, that presumption "does not relieve the sentencing court of its obligation to explain to the parties and the reviewing court its reasons for imposing a particular sentence." *Id.* at 554. "Where a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *Id.* In *Richardson*, this court upheld the imposition of a sentence at the high end of the guidelines range because it did not "simply select" a sentence but alluded to many of the § 3553(a) factors when imposing it. Furthermore, we have explained that *Richardson* does not require a district court to address every argument raised by a defendant:

> In several cases since *Richardson* . . . this court has made it clear that a district court need not explain its reasons for rejecting each argument made by a defendant. In *United States v. Jones*, 445 F.3d 865 (6th Cir. 2006), this court held that a sentence does not lose its presumption of reasonableness "whenever a district judge does not explicitly address every defense argument." *Id.* at 871. Likewise, a per curiam opinion in *United States v. Feazell*, 219 Fed. App'x 430 (6th Cir. 2007), held that "*United States v. Richardson*, 437 F.3d 550 (6th Cir. 2006), does not compel district courts to address every argument the defendant raises – no matter how non-meritorious or undeveloped it is – in imposing a sentence." *Feazell*, 219 Fed. App'x at 433. Furthermore, this court has also said that "[a] sentencing judge has no more duty than we appellate judges do to discuss every argument made by a litigant; arguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence." *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006) (quoting *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005)).

*United States v. Smith*, 510 F.3d 603, 608 (6th Cir. 2007).

Defendant contends that the district court failed to "address Miss Calhoun's mitigation argument in support of her request for a variance." However, she does not identify the contours of the argument. The disparity in sentencing contention was addressed by the district court, leaving defendant's health problems as the only possible mitigation argument. Nor is it clear from the sentencing transcript that trial counsel asked the district court for a variance. The closest he came was when he asked the court to impose a sentence "at the lowest end [of the guidelines range], if not a departure below." We affirm the sentence. The judge focused on the need for the sentence to reflect the seriousness of the crime and to deter defendant, both of which are factors found in §3553(a). He also took into consideration the personal characteristics of defendant as reflected by his allusion to the supportive letters that he received on her behalf. In short, while it might have been preferable for the judge to address defendant's health concerns, his failure to do so explicitly does not render the sentence unreasonable, particularly in light of the fact that it falls at the low end of the guidelines range.

**III.**

The judgment and sentence are **affirmed**.