NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0071n.06
No. 22-3998

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Feb 21, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| ANDREW DODSON, | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: BATCHELDER, CLAY, and GIBBONS, Circuit Judges.

**CLAY, Circuit Judge**. Defendant Andrew Dodson appeals his conviction and sentence of 55 months' imprisonment for one count of obstructing justice by retaliating against a witness, victim, or an informant in violation of 18 U.S.C. § 1513(b)(2). Dodson raises four arguments on appeal. First, Dodson argues that, in light of the Supreme Court's recent decision in *Counterman v. Colorado*, there was insufficient evidence to support his conviction. 600 U.S. 66 (2023). Second, Dodson argues that the district court erred in permitting testimony at trial related to certain prejudicial prior acts. Finally, Dodson's third and fourth arguments respectively contend that the district court erred during sentencing by applying an improper 8-level enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and by imposing certain inappropriate supervised release conditions. Only Dodson's fourth argument related to his supervised release conditions has merit. Therefore, the Court **AFFIRMS** Dodson's conviction and sentence, except with respect to the supervised

release conditions; **VACATES** Dodson's challenged supervised release conditions; and **REMANDS** to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

Prior to the events of the instant case, the Orange Police Department arrested Defendant Andrew Dodson for an alcohol-related driving offense in 2021. During the officers' impounding and search of the vehicle, they found a variety of items that are commonly used to create explosive devices, such as potassium perchlorate, potassium nitrate, batteries, powdered sugar, and Vaseline. Dodson claimed that he used these materials to make smoke bombs, denying that he ever constructed explosive devices. Nonetheless, due to the concerning nature of Dodson's possession of these items, the FBI became involved and began investigating Dodson.

To thoroughly investigate Dodson's background, in August 2021, the FBI interviewed his ex-partner, Sarah McNamara. Dodson and McNamara dated for over three years and shared custody of their child. During the FBI's interview, McNamara described her experience with Dodson's volatile personality, his past construction of explosive devices, and various offensive tattoos that Dodson had. Based in part on the information provided by McNamara, Dodson pleaded guilty to making a false statement to a federal agent of the United States.[1]

After Dodson's guilty plea, the probation office prepared a presentence report dated February 10, 2022, detailing the statements of "Witness 1" that resulted in Dodson's conviction.

---

[1] Specifically, Dodson previously stated that he had never constructed an explosive device, which McNamara's statement explicitly refuted. After being presented with this contradictory information, Dodson pleaded guilty to the offense of lying to an agent of the United States, in violation of 18 U.S.C. § 1001(a)(2).

Based on the statements included in the 2022 presentence report, Dodson inferred that McNamara was "Witness 1." Shortly after, on February 15, 2022, McNamara received a number of aggressive, threatening communications from Dodson via TalkingParents, an application that preserves unaltered records of co-parents' communications. These messages included the following statements from Dodson:

> So i just got the final paperwork from the FBI. You said A LOT of bad s- -t about me. . . . You fucked me. You fucked me. You fucked me. . . .

> Youre a piece of shit and i hope you fucking die slowly, very soon. Wanna knowwhy im in trouble, becUse of you. . . .

> Hopefully youll Be dead to everyone soon you fucking snitch. . . .

> Youre dead. . . .

Pet'r's Br., ECF No. 33, 15–17. Fearing that Dodson would harm her due to her prior statements to the federal agent, McNamara left her home with her four children and contacted the FBI. Based on these messages and McNamara's fear, the Mogadore Police Department went to Dodson's residence to take him into custody. At Dodson's residence, Dodson willingly showed the police the messages on his phone and cooperated with the arrest. Dodson was ultimately charged with obstructing justice by retaliating against an informant, in violation of 18 U.S.C. § 1513(b), as well as transmitting an interstate communication containing a threat to injure, in violation of 18 U.S.C. § 875(c).

## II. Dodson's Jury Trial

Prior to trial, the government filed several preliminary documents, including: (1) a notice of intent to introduce 404(b) evidence as to Dodson, (2) a motion in limine to restrict mention of certain past custody disputes at trial, (3) a trial brief, and (4) proposed jury instructions. Dodson did not respond to any of these filings, and the jury trial commenced on July 25, 2022. After the

3

jury was selected, the district court reserved ruling on these motions and advised the parties' attorneys to raise any objections regarding character evidence during the testimony of the respective witnesses.[2]

First, the government called Jennifer Kiesel, an FBI special agent who worked on Dodson's underlying case regarding the possession of explosive devices. In particular, Kiesel interviewed McNamara in August 2021 and gleaned information relevant to her relationship with Dodson, as well as Dodson's prior possession and construction of explosive devices. The probation officer who authorized the presentence report that sparked Dodson's threatening messages then testified that the report identified McNamara as the witness who provided information pertinent to Dodson's 18 U.S.C. § 1001(a)(2) charge.

To establish the content of Dodson's messages and their effect, McNamara testified that Dodson's text stating, "I hope you fucking die slowly very soon" and "you're dead" caused her to fear for her safety, as prior contentious communication with Dodson did not involve similar threats. Further, two prior acts of abuse caused her to believe that Dodson was capable of carrying out his threats. Those past acts by Dodson included kicking her in the ribs in May 2016, and ramming her vehicle with his in August 2016. In both instances, the police were called to the scene, and Dodson faced charges. Both of these charges were eventually reduced to disorderly conduct convictions. Following McNamara's testimony, the government called the officer who

---

[2] At this time, Dodson's attorney made an "oral motion in limine," objecting to the use of prejudicial testimony related to Dodson's explosive devices, tattoos, or bomb making. Trial Tr. Vol. I, R. 49, Page ID #342. The district court also reserved ruling on this motion until Dodson's attorney raised his objection during the respective witnesses' testimony. The objection was never re-raised.

responded to the 2016 incidents, who provided further context and information related to the events.

Finally, the government called the two officers involved in the events of February 15, 2022, following receipt of McNamara's complaint regarding the messages. Craig Jones, a Mogadore police detective, arrested Dodson at his residence and testified that he cooperated throughout his detainment. Next, special agent Peter Mauro testified that he served as the case agent for Dodson's 2021 explosive devices investigation and, accordingly, interviewed McNamara on February 15, 2022. Mauro recounted McNamara's fear and agitation, explaining that Dodson's messages made her feel the need to leave her home with her four children. Additionally, Mauro reviewed the entirety of Dodson and McNamara's TalkingParents messages, explaining that, although the messages evidenced contentious disputes over parenting, there were no similar threats within their chat history.

Following closing arguments, Dodson's attorney moved for a judgment of acquittal, which the district court denied. After receiving instructions related to the two charges and deliberating, the jury returned a verdict of guilty as to Count One (retaliating against an informant in violation of 18 U.S.C. § 1513(b)(2)) and not guilty as to Count Two (interstate communications in violation of 18 U.S.C. § 875(c)). Because the two counts essentially shared all but one element in common, this Court can fairly conclude that the jury found that the government did not meet its burden in proving that Dodson transmitted the communication *knowing* that the communication would be viewed by McNamara as a threat, thus resulting in its not guilty verdict as to Count Two.

### III. Dodson's Sentencing

Prior to sentencing, the probation department prepared a presentence report providing a Guidelines range of 46 to 57 months' imprisonment and ultimately recommending that Dodson

receive 46 months' imprisonment. In calculating Dodson's offense level, the presentence report recommended an increase of 8 levels due to Defendant's threat of physical injury to McNamara in order to obstruct the administration of justice.

Dodson did not object to this 8-level enhancement. Instead, Dodson solely objected to the government's requested special conditions of supervised release and highlighted various minor factual inaccuracies that the probation department corrected. McNamara also submitted a victim impact statement, explaining the emotional and physical toll this case took on her, as well as stating that she preferred to provide the court with a written statement due to her fear of attending the sentencing hearing in person.

During sentencing, the district court made an initial finding that Dodson's offense level was 22 and his criminal history category was II, resulting in a Guidelines range of 46 to 57 months' imprisonment. Dodson declined to make a statement but responded to the court's questioning regarding his extensive history of alcohol and substance abuse. After considering the Defendant's criminal history, historic problems with alcohol, his anger-management issues, and the nature of the instant offense, the district court imposed a within-Guidelines sentence of 55 months' imprisonment, followed by three years of supervised release.

Turning to the conditions of Dodson's supervised release, the district court imposed various standard conditions, as well as three notable special conditions. First, the district court subjected Dodson to a no-contact order, restricting him from communicating in any manner with McNamara during imprisonment and his supervised release. Second, the district court imposed an internet restriction, prohibiting Dodson from using the internet in any form, at any location, without prior written approval of his probation officer. In adopting the internet restriction proposed by the government, the district court reasoned that the condition was appropriate because Dodson

communicated his threat to McNamara through the internet. Third, without explaining its reasoning, the court restricted Dodson's "viewing and possession of books, pamphlets, websites, blogs, chat rooms, videos, and social media platforms that reflect extremist or terroristic views." Sent'g Hr'g Tr., R. 48, Page ID #260.

During the sentencing hearing, Dodson's attorney failed to object on any grounds other than "the part of the sentence regarding the computer restrictions and the books, pamphlets, websites thing." *Id.* at Page ID #261. The district court's judgment was entered on November 28, 2022, and this timely appeal followed.

## DISCUSSION

## I. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

This Court reviews *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007). A sufficiency of the evidence claim requires that the Court view the evidence "in the light most favorable to the prosecution." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). The question this Court must ask is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

### B. Analysis

Because the jury found Dodson "not guilty" as related to Count Two, only the sufficiency of the evidence supporting the jury's findings as to Count One—obstructing justice by retaliating against a witness—is in dispute. Under § 1513(b)(2),

7

(b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;

or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1513(b)(2). Therefore, the jury was instructed that the government must prove the following elements beyond a reasonable doubt to obtain a conviction: (1) the defendant's conduct threatened to cause bodily injury to another person; (2) the defendant acted with a specific intent to retaliate against that person for providing information to a law enforcement officer relating to the possible commission of a federal offense; and (3) the defendant knowingly engaged in this conduct. *See United States v. Edwards*, 321 F. App'x 481, 484 (6th Cir. 2009); *United States v. Draper*, 553 F.3d 174, 180 (2d Cir. 2009). In this case, the district court further defined "knowingly" as "voluntarily and purposely and not by intent or mistake." Trial Tr. Vol. II, R. 50, at Page ID #505. Therefore, the jury did not have to find that Dodson intended to carry out his threat; instead, the jury only needed to find that Dodson sent the threat purposely with the intent to retaliate against McNamara.

In challenging the sufficiency of the evidence as to Count One, Dodson presents two main arguments. Dodson argues that there was insufficient evidence "that the messages sent from Mr. Dodson were actual threats," and "that Ms. McNamara was a witness who provided information related to the commission . . . of a [f]ederal offense." Pet'r's Br., ECF No. 33, 35. We will address each of these arguments in turn.

### 1. Threatening Nature of the Messages

First, Dodson claims that no reasonable juror could find that the messages he sent through the TalkingParents app constituted actual threats. In doing so, Dodson argues that his messages were not sufficiently specific to be considered threats. Contrary to Dodson's definition of a "specific threat," there is no requirement contained within the statute that the threats detail the exact manner in which they will be effectuated.

Viewing the evidence in the light most favorable to the prosecution, Dodson messaged McNamara various threats, including, "You're dead," and "You're a piece of shit and I hope you fucking die slowly very soon." Trial Tr. Vol. I, R. 49, Page ID #398, 401. Dodson sent these messages after reviewing the "final paperwork from the FBI" and initiated these communications by stating, "You said a lot of bad shit about me. . . . You fucked me." *Id.* at Page ID #393. When questioned about these messages during trial, McNamara recounted that she felt "terrified for not only [her] life and safety but [her] children's as well." *Id.* at Page ID #436. Therefore, after the messages from Dodson continued to escalate, McNamara contacted the FBI, gathered her belongings and her children, and went to stay at her fiancé's mother's house.

On appeal, Dodson claims that McNamara did not view *all* of Dodson's speech as threats and never disengaged from the messages. Because there "was never a specific threat," Dodson argues that the contentious messages exchanged did not rise to the level of violating § 1513(b)(2). Pet'r's Br., ECF No. 33, 38. Tellingly, Dodson's only citations to support this proposition that his threats needed to be more specific involve a 1917 statute prohibiting knowing and willful threats to take the life of the President, *Watts v. United States*, 394 U.S. 705 (1969), and Virginia's statute banning cross burning with an intent to intimidate a person, *Virigina v. Black*, 538 U.S. 343 (2003). Beyond these cases being factually inapposite, they do not establish the specific-threat requirement

Dodson claims to derive from them. Instead, they stand for the proposition that the First Amendment does not protect a "true threat," defined as a serious expression of an intent to commit unlawful violence, even when the "speaker [does] not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60; *see also Watts*, 394 U.S. at 707–08 (distinguishing "true threats" from facetious or hyperbolic remarks). The jury's decision in this case was clearly supported by this precedent, as Dodson may not have intended to carry out his threat, but his statement could reasonably be viewed as a serious expression of intent to commit unlawful violence. *See Counterman v. Colorado*, 600 U.S. 66, 72 (2023) ("True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection.").

While Dodson's initial brief, filed in May 2023, offered no supporting case law to bolster his unconvincing contentions that his threat was not "sufficiently specific," the Supreme Court directly addressed the *mens rea* necessary to prosecute true-threat crimes in June 2023. Thus, in further support of his argument that he never specifically threatened McNamara, Dodson submitted a Rule 28(j) letter, informing the Court of the Supreme Court's recent *Counterman* decision. 600 U.S. 66. Although *Counterman* presents a compelling question as to the sufficiency of the evidence supporting his conviction, Dodson's arguments nevertheless fail both before and after the Supreme Court's recent decision.

In *Counterman*, the Supreme Court held that, for a true threat to be outside the bounds of the First Amendment's protection, the speaker must act recklessly—in other words, the speaker must be subjectively "aware 'that others could regard his statements as' threatening violence and 'deliver[] them anyway.'" *Counterman*, 600 U.S. at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)). To combat chilling speech that should be protected, the Supreme Court adopted a subjective mental-state element for true-

threat cases. *Counterman*, 600 U.S. at 72–73. Relying upon this newly instituted recklessness standard, Dodson argues that he did not have any subjective understanding of the threatening nature of his messages, and that his conviction was in violation of the First Amendment.

In response, the government argues that *Counterman* is inapplicable to Dodson's conviction, as § 1513(b)(2) has a *mens rea* of knowingly, which is even higher than the recklessness required by *Counterman*. However, this argument misunderstands general intent versus specific intent, as well as which element in § 1513 requires specific intent. *See, e.g.*, *United States v. Kimes*, 246 F.3d 800, 807 (6th Cir. 2001) ("[A] general intent crime requires the knowing commission of an act that the law makes a crime. A specific intent crime requires additional 'bad purpose.'" (quoting *United States v. Kleinbart*, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994))). Section 1513(b) requires that Dodson knowingly commit the *actus reus*—sending the threatening messages—rather than by accident or mistake. Additionally, Dodson must possess the specific intent to retaliate against an informant. *Cf. United States v. Edwards*, 783 F. App'x 540, 543 (6th Cir. 2019) (recognizing that the specific intent to retaliate is required under § 1513(e)).

In contrast, *Counterman* requires something more: that the defendant be aware in some way of the threatening nature of his communications. *See Counterman*, 600 U.S. at 72 n.2 (distinguishing the awareness of a communication's contents and awareness of its threatening nature). Indeed, the jury acquitted Dodson of Count Two, which required him to *know* that the messages would be received as a threat.[3] Further, when explaining the *mens rea* necessary for a

---

[3] In contrast to Count One, which the district court instructed could be committed if it was done "voluntarily and purposely and not by intent or mistake," Count Two required the jury to find that Dodson made a threat "knowing the communication would be viewed as a threat." Trial Tr. Vol. II, R. 50, Page ID #505–06. The government further explained this difference in intent in its closing argument, noting that Count One required the defendant to "knowingly engage in conduct,"

conviction under § 1513(b)(2) in its closing argument, the government specifically highlighted that it "[did not] have to show [] that he intended for this [message] to be viewed as a threat." Trial Tr. Vol. II, R. 50, Page ID #536. Although this statement remains true post-*Counterman* (as the case law does not require a *mens rea* of purposefully or knowingly), *Counterman* does require the government to show that Dodson was aware that others could view his messages as threatening violence and *recklessly* sent them anyway. Therefore, *Counterman* imbues "true threat" prosecutions with a subjective intent requirement that was not previously required by the district court in this case or the Sixth Circuit generally.

Nonetheless, Dodson does not challenge the district court's jury instructions under *Counterman*; instead, he challenges only the sufficiency of the evidence. Under the Fourteenth Amendment, the evidence is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The government's evidence was sufficient to satisfy *Counterman*, as Dodson's statements that McNamara was "dead," and that he "hope[d] [she] fucking die[d] slowly, very soon" could constitute a reckless disregard that others could view his statements as threatening violence in the eyes of a rational juror. *Cf. United States v. Bauer*, 82 F.4th 522, 528–29 (6th Cir. 2023) (analyzing a sufficiency of the evidence claim following a Supreme Court opinion requiring an additional element of *mens rea* related to the defendant's crime, and holding that a jury could find that the new requirement was satisfied based on the evidence presented at trial).

Indeed, the trial included extensive evidence that Dodson acted with, at the very least, recklessness as to the risk that his messages would be viewed as threatening violence. First, even

---

while Count Two required the defendant to "know[] that [the messages would] be viewed as a threat." *Id.* at Page ID #535.

though the couple frequently exchanged contentious messages, Dodson had never sent McNamara these types of threats of death before. Further, these messages were sparked by Dodson realizing McNamara shared information with the government leading to his conviction, which contextualizes the outcome Dodson hoped to obtain by sending the threats. Finally, the couple was getting along prior to Dodson's awareness of McNamara's interview statements, heightening the severity of the abrupt change in tone. Although Dodson may have been initially surprised when the FBI agents showed up to his house to inquire about the threatening exchange, once he realized their presence related to certain messages that he sent, Dodson knew exactly which messages were at issue—the ones stating, "You're dead." Trial Tr. Vol. I, R. 49, Page ID #453–54. Because there is no manner more direct and explicit to express this particular threat, a reasonable juror could find that Dodson recklessly disregarded the threatening nature of his speech. Therefore, Dodson's challenge to the sufficiency of the evidence on the recklessness element fails in light of the *Counterman* decision.

### 2. Witness, Victim, or Informant Requirement

Dodson also argues that, because McNamara was not a witness to Dodson's charged federal offense, there was insufficient evidence to convict him of Count One. In his 2021 case, Dodson was not actually convicted of illegally possessing explosives or any other related federal crime; instead, he pleaded guilty to lying to law enforcement. Therefore, Dodson argues that although McNamara made certain statements about him to law enforcement, "her comments did not establish her as a witness to any federal or possible federal offense," inasmuch as he was never convicted of any charge related to explosives. Pet'r's Br., ECF No. 33, 36–37.

The government correctly points out that § 1513(b)(2) prohibits retaliation against any person for "any information relating to the commission or *possible commission* of a Federal

offense." 18 U.S.C. § 1513(b)(2) (emphasis added). The record illustrates that McNamara told the FBI that Dodson previously constructed and detonated an explosive device, which directly contradicted a prior statement that he made after being arrested. Further, McNamara's interview contained information related to the *possible* commission of other criminal offenses, such as possessing an unregistered explosive device.

In addition, the statute contains no requirement that McNamara must be a witness or officially participate in a future proceeding related to a federal conviction, and Dodson points to no case law or statutory interpretation stating as much. *Cf. United States v. Edwards*, 321 F. App'x 481, 483 (6th Cir. 2009) (confidential informant faced threats); *United States v. Pullam*, No. 93-50532, 1994 WL 661214, at *5 (9th Cir. Nov. 23, 1994) (recognizing that "Section 1513(a)(2) forbids intentional retaliation against an informant"—not only intentional retaliation against witnesses). In fact, the statute itself is entitled "Retaliating against a witness, victim, *or an informant*." 18 U.S.C. § 1513 (emphasis added). Therefore, based on the evidence presented at trial, a rational trier of fact could easily find that McNamara provided information regarding Dodson's possible commission of a federal offense. Dodson's challenge to the sufficiency of the evidence on this element also fails.

## II. RULE 404(b) PRIOR ACTS

### A. Standard of Review

The admission of evidence under Rule 404(b) involves both questions of fact and law. *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000). Therefore, this Court frequently applies differing standards of review to the various evaluations that a district court must make in ruling on a Rule 404(b) question. *See United States v. Gibbs*, 797 F.3d 416, 421–22 (6th Cir. 2015); *United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017). However, because Dodson's attorney failed

14

to raise any argument regarding the 2016 disorderly conduct convictions, this Court reviews the district court's decision to admit the prior acts evidence for plain error. *See, e.g.*, *United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000) (analyzing 404(b) claims using plain error); *United States v. Robinson*, 99 F. App'x 655, 656 (6th Cir. 2004) ("But we review [defendant's] Rule 404(b) evidence argument for plain error because she forfeited this error by failing to raise it in the district court."); *United States v. Heflin*, 600 F. App'x 407, 411 (6th Cir. 2015) (concluding that plain error review applied where defendant did not preserve his Rule 404(b) objection).

Plain error review requires the Court to consider whether there is: "(1) error (2) that was 'obvious or clear,' (3) that 'affected [the] defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (alteration in original) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).

## B. Analysis

Dodson argues that the district court erred by permitting McNamara and a police sergeant to testify regarding certain alleged prior acts. Although Dodson does not dispute that the prior acts—namely, two 2016 disorderly conduct convictions stemming from altercations between Dodson and McNamara—took place, he argues that the misdemeanors were not admissible for a proper purpose and substantially prejudiced the trial.

In evaluating whether the prior acts were admitted for a proper purpose, the trial court must determine "whether that evidence is probative of a material issue other than character." *United States v. Bell*, 516 F.3d 432, 441 (6th Cir. 2008) (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). "Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is

offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *United States v. Rayborn*, 495 F.3d 328, 342 (6th Cir. 2007) (quoting *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003)). The government argues both that Dodson's prior misdemeanor convictions illustrate Dodson's intent and supply helpful background information to the finder of fact under a *res gestae* theory. The former theory is dispositive in addressing whether a proper purpose for admitting the evidence existed.

In this case, Dodson placed his intent at issue when he pleaded not guilty to the charges. During closing arguments, the thrust of defense counsel's final words to the jury highlighted that "the one big thing in dispute" was whether the Defendant transmitted the communication for the purpose of making a threat. Trial Tr. Vol. II, R. 50, Page ID #525, 530. Based on Dodson's principal theory at trial, the prior acts evidence was admissible to show intent or lack of mistake, both of which are permissible under Rule 404(b). *See, e.g.*, *United States v. LaVictor*, 848 F.3d 428, 446 (6th Cir. 2017). To prove Count One, the government needed to prove that Dodson intended to retaliate; to prove Count Two, the government needed to show that Dodson *knew* the communication would be viewed as a threat. Therefore, the prior acts evidence was offered to illustrate the reason McNamara viewed the messages as credible threats. Overall, the two offenses at issue—disorderly conduct charges involving prior heated arguments with McNamara—are indicative of Dodson's specific intent to threaten McNamara in a manner that she would perceive as a threat.

The district court fairly concluded that the probative value of the evidence of the 2016 disorderly conduct convictions was not substantially outweighed by the risk of unfair prejudice. Fed. R. Evid. 403. "Broad discretion is given to district courts in considerations of relevance and prejudice, and those decisions will not be lightly overruled." *LaVictor*, 848 F.3d at 447. In

16

assessing the district court's balancing of the evidence, this Court "look[s] at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006) (quoting *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979)). Dodson argues that the testimony related to his 2016 convictions was unfairly prejudicial, as the misdemeanors occurred over six years ago, and the alleged victim lacked credibility.

Although the accounts of the 2016 convictions were prejudicial, the district court did not plainly err in concluding that the evidence's probative value outweighed its prejudicial impact. By presenting the context of the couple's past relationship, the evidence assisted in establishing Dodson's intent. Further, there is no absolute rule regarding the number of years that can separate offenses in determining the admissibility of other acts evidence. *See, e.g.*, *Whitis v. United States*, No. 94-6333, 1995 WL 462423, at *8 (6th Cir. Aug. 3, 1995) (concluding the trial court did not abuse its discretion in admitting a prior act of battery that occurred more than five years prior in the instant serious bodily injury case). The district court also provided the jury with a limiting instruction to solely consider past acts "as it relates to the government's claim on the defendant's intent, motive, or plan," and not for any other purpose, thus ameliorating the risk of unfair prejudice. Trial Tr. Vol. II, R. 50, Page ID #499.

Finally, Dodson contends that district court independently erred because he did not receive the opportunity to challenge McNamara's credibility by "cross examin[ing] the alleged victim about the other police reports listed in the government's Motion in Limine." Pet'r's Br., ECF No. 33, 47. However, Dodson's attorney never attempted to enter the other police reports, to cross McNamara on other events, to impeach McNamara, or to object on these grounds during trial. The district court had no indication that Dodson wanted any additional exhibits or reports entered and,

17

in fact, explicitly instructed the parties to object if needed at the time that past act evidence would be offered. Dodson's attorney failed to do so. Therefore, the district court certainly did not err—much less plainly err—by failing to *sua sponte* provide Dodson with an opportunity "to introduce evidence [that] he did not ask to introduce." Gov't Br., ECF No. 40, 42.

## III. SENTENCING ENHANCEMENT UNDER U.S.S.G. § 2J1.2(b)(1)(B)

### A. Standard of Review

This Court typically reviews a criminal sentence under a deferential abuse of discretion standard for both procedural and substantive reasonableness. *United States v. Shannon*, 803 F.3d 778, 787 (6th Cir. 2015). On appeal, Dodson argued that the district court incorrectly applied the Sentencing Guidelines, which focuses this Court's inquiry on the procedural reasonableness evaluation. However, because Dodson failed to object to the challenged sentencing factor before the district court, his challenge will be reviewed for plain error. *United States v. Sherrill*, 972 F.3d 752, 768–69 (6th Cir. 2020).

### B. Analysis

Under the relevant Sentencing Guidelines, district courts may increase a defendant's offense level by eight points "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G § 2J1.2(b)(1)(B). In calculating Dodson's offense level, the presentence report recommended applying an 8-level increase to the Guidelines' initial recommendation of 14 based on this provision because:

> The defendant told [McNamara] that she said several bad things about him to the FBI and further stated that he hopes she dies slowly and very soon. This text conversation occurred before the disposition of case 1:21CR717, before the Honorable Philip J. Calabrese.

18

PSR, R. 34, Page ID #187. Relying on this enhancement, the presentence report calculated Dodson's total offense level at 22. In conjunction with his criminal history category of II, the report ultimately recommended a Guidelines range of 46 to 57 months' imprisonment. Dodson's attorney did not object to this 8-level increase in response to the presentence report, nor did he orally object to the increase at sentencing. Therefore, the district court had no opportunity to address this argument. *See United States v. Johnson*, 658 F. App'x 244, 247 (6th Cir. 2015).

On appeal, Dodson argues that this 8-level sentencing enhancement was in error, as Dodson's threatening messages were not sent with the purpose of obstructing the administration of justice. Because Dodson had already pleaded guilty to the offense of lying to a federal agent and was awaiting sentencing by the time he sent the messages, he argues that he could not have sent the texts with the intent to obstruct justice, as there was no upcoming trial. In response, the government claims that McNamara would have been an integral government witness had the case against Dodson gone to trial, and she was an integral witness in the instant intimidation case. Therefore, Dodson's threats of death would "naturally cause[] [McNamara] to reflect on the benefits and costs of providing testimony against Dodson." Gov't Br., ECF No. 40, 47.

In contrast to Dodson's argument that he did not obstruct the investigation, prosecution, or sentencing of his 2021 matter, the enhancement at issue does not require his actions to *result* in substantial interference—it solely requires a threat to cause physical injury "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). In fact, there is a separate increase for instances where the conduct actually results in a substantial interference. *See id.* § 2J1.2(b)(2). Therefore, Dodson's arguments that McNamara never officially served as a witness and that he never in fact prevented McNamara from making any statements fail.

19

Further, Dodson argues that he did not make the threat to obstruct the administration of justice because he already pleaded guilty—instead, he simply made the threat out of anger.[4] This reasoning is also wanting, as the presentence report specifically stated that these threats were made *prior to* the final disposition of his other case, and Dodson does not contest this fact.[5] Therefore, based on Dodson's threats, McNamara could have declined to provide additional information to the district court during sentencing. *Cf. United States v. Real*, 817 F. App'x 278, 280–81 (8th Cir. 2020) (holding that, where defendant inferred who the government's confidential witness was by reading the PSR and subsequently threatened him, there was sufficient basis to apply an obstruction of justice enhancement, as the informant "could be a potential witness at [the defendant's] sentencing.").

Importantly, just like retaliation in any other context, such action is prohibited due not only to the risk of deterring participation in the instant offense, but also to the chilling effect that the threats of physical injury may have on *future* activity. *See, e.g.*, *United States v. Weston*, 960 F.2d

---

[4] Dodson cursorily states in his 28(j) letter that *Counterman* should also apply to the sentencing enhancement and requires recklessness as to the threatening nature of the communications. However, Dodson did not brief this argument, instead contending that he did not intend to obstruct justice—not that he did not make true threats.

[5] The district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). Dodson did not dispute the portions of the presentence report that established the applicability of the 8-level enhancement. Therefore, in accordance with the undisputed presentence report, Dodson's threats occurred before the disposition of his 2021 case. Without such an objection, the district court was not required to explicitly find that Dodson committed the relevant conduct. *See United States v. Nichols*, 802 F. App'x 172, 179 (6th Cir. 2020) (citing Fed. R. Crim. P. 32(i)(3)(A)); *United States v. Davy*, 713 F. App'x 439, 448 (6th Cir. 2017) ("Accordingly, when a [party] fails to object to factual statements contained in a PSR, those statements are no longer mere allegations but become admissions sufficient to support factual findings relevant to sentencing without the need for any independent factual findings.").

212, 218 (1st Cir. 1992) (rejecting defendant's argument that witness retaliation is strictly past-oriented, stating that "retaliatory act[s] [frequently] occur[] in response to conduct capable of repetition.  In such circumstances, the act often contains an aposematic component, expressing both a backward-looking intention (designed to punish for past misdeeds) and a forward-looking intention (designed to deter repeat performances)."); *Pullam*, 1994 WL 661214, at *5 ("Because Pullam had not yet been sentenced, we conclude his conduct was within [the obstruction of justice enhancement]."); *United States v. Smith*, 387 F.3d 826, 831 (9th Cir. 2004) ("Smith's retaliatory intent inevitably operated to obstruct justice, as Smith threatened a witness who would presumably have provided additional assistance to the government as its burglary prosecution progressed."); *United States v. Duarte*, 28 F.3d 47, 49 (7th Cir. 1994) (rejecting defendant's argument that he already pleaded guilty and, thus, did not make the threats to obstruct justice by stating "we cannot think of any reason why the guideline's authors would have wanted to distinguish between vengeful and instrumental retaliations and punish the former more lightly.").[6]  Not only would McNamara be deterred from testifying in the 2021 case as needed, but she also could decline to assist the FBI in the future, fearing death threats (or abusive action) from her ex-partner.  By way of example and not limitation, the chilling effect could have prevented McNamara from providing

---

[6] *Cf. United States v. Turner*, 738 F. App'x 856, 862–63 (6th Cir. 2018) (in the context of an enhancement under U.S.S.G. § 3C1.1, which requires an obstruction of justice with respect to the *instant* investigation or prosecution, the Court held that retaliation against a witness following the defendant's sentencing did not obstruct justice "with respect to the instant [completed] offense.").  Not only did Dodson's retaliation occur *before* sentencing, but U.S.S.G. § 2J1.2 contains no similar limitation to "the instant offense."  *See United States v. Denham*, 436 F. App'x 627, 630 (6th Cir. 2011) ("Admittedly, § 3C1.1 reaches obstructive conduct only with respect to the particular offense of conviction, while § 2J1.2(b)(1)(B) concerns itself with conduct intended to obstruct the conduct of other proceedings.").

additional information to assist the district court in sentencing in the 2021 case, deterred McNamara from testifying in the instant witness intimidation case, or caused McNamara to alter her prior statement to the FBI. For these reasons, the district court did not plainly err in applying the 8-level enhancement.

## IV. SPECIAL CONDITIONS OF SUPERVISED RELEASE

### A. Standard of Review

Where a challenge to a supervised release condition is properly preserved, "we consider whether the district court abused its discretion in imposing [the contested] special conditions." *United States v. Inman*, 666 F.3d 1001, 1004 (6th Cir. 2012). This standard of review requires the Court to consider the procedural and substantive reasonableness of the contested special conditions. *United States v. Carter*, 463 F.3d 526, 528–29 (6th Cir. 2006). Generally, the district court has broad discretion to impose appropriate conditions of supervised release, but procedural reasonableness requires the court to state its rationale for mandating a special condition of supervised release. *United States v. Ritter*, 118 F.3d 502, 506 (6th Cir. 1997); *United States v. Widmer*, 785 F.3d 200, 203 (6th Cir. 2015).

Once the Court "determine[s] whether the district court adequately stated in open court at the time of sentencing 'its rationale for mandating special conditions of supervised release,'" it can turn to the substantive reasonableness inquiry. *United States v. Brogdon*, 503 F.3d 555, 563 (6th Cir. 2007) (quoting *Carter*, 463 F.3d at 528–29); *see also Widmer*, 785 F.3d at 204. In evaluating the substantive reasonableness of the imposed conditions, each condition of supervised release must be "reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public." *Ritter*, 118 F.3d at 504 (quoting *United States v. Bortels*, 962 F.2d 558, 560 (6th Cir. 1992)). The conditions must reasonably relate to the nature of the offense and

22

the history of the defendant, involving "no greater deprivation of liberty than is reasonably necessary to serve the goals of deterrence, protecting the public, and rehabilitating the defendant." *Inman*, 666 F.3d at 1004 (internal quotations omitted); 18 U.S.C. § 3583(d)(1)–(2). Finally, the condition must also be consistent with any pertinent policy statements issued by the United States Sentencing Commission. 18 U.S.C. § 3583(d)(3).

## B. Analysis

The district court imposed several special conditions on Dodson's supervised release, two of which he challenges on appeal.[7] These special conditions were not recommended by the initial presentence investigation report, but rather requested by the government "based upon the relevant evidence that Defendant utilized the internet and social media to communicate with other users about the construction of destructive devices and has threatened violence [using the internet]."[8] PSR, R. 34, Page ID #204. Based on the government's recommendation, the district court adopted the two challenged special conditions for Defendant's supervised release, which prohibited him from: (1) accessing the internet without his probation officer's prior approval, and (2) accessing extremist materials. We evaluate each of these supervised release conditions in turn.

### 1. Prohibition From Accessing the Internet

In imposing the internet restriction, the district court reasoned, "the internet restriction is because this is how – you got on the internet and threatened Ms. McNamara, so you can't get on

---

[7] Dodson does not challenge the supervised release condition of no contact with the victim. Instead, Dodson relies on the validity of the no-contact order to bolster his argument that the internet restrictions were overly broad.

[8] The ultimate sentencing recommendation by the probation department adopted and recommended the internet restriction to the extent the court deemed such a restriction appropriate, but not the extremist views restriction.

and use the internet without prior written approval of your supervising officer." Sent'g Hr'g Tr., R. 48, Page ID #260. From this short statement, we can infer that the condition is at least somewhat related to the nature of the instant offense. Thus, the main question facing this Court is the condition's substantive reasonableness. Namely, we must consider whether a complete ban on internet access without permission involves "no greater deprivation of liberty than is reasonably necessary to serve the goals of deterrence, protecting the public, and rehabilitating the defendant." *Inman*, 666 F.3d at 1004 (cleaned up).

The district court subjected Dodson to several special conditions of supervised release not challenged on appeal that affect our analysis. For example, Dodson must submit his person, property, house, residence, vehicle, papers, computers, and other electronics to periodic searches and seizures based on reasonable suspicion. Further, the court imposed a no-contact order for the period of Dodson's incarceration and supervised release. In addition to the internet ban's attenuation from the sentencing goals, these conditions negate the need for a complete ban on Dodson's internet access.

First, restricting Dodson's internet access does not satisfy the need to protect the public from further crimes. 18 U.S.C. § 3553(a)(2)(C). According to the record, Dodson has never threatened a government witness—or anyone besides McNamara—in the past. Instead, these threatening, explicit messages were directly related to his contentious relationship with McNamara and his feelings of anger towards her. Therefore, because Dodson's illegal actions were clearly pointed toward McNamara, the no-contact order suffices to deter Dodson from using the internet, texting, calling, or engaging in any other form of communication in an attempt to resume the behavior that resulted in his conviction. Further, if Dodson's probation officer reasonably suspected that Dodson was engaged in illicit online activity, he would be subject to a seizure and

search of his electronics. Even if the district court wanted to credit the government's allegations regarding Dodson's alleged "extremist" social media use, it could impose a narrowly tailored, appropriate internet restriction on Dodson in light of the variety of technological options at its disposal.[9] *See, e.g.*, *United States v. Perazza-Mercado*, 553 F.3d 65, 74 (1st Cir. 2009) (vacating restrictive internet condition and remanding to the district court, noting that "[s]uch an approach reconciles our concern that a convicted sex offender could use the internet to continue a pattern of inappropriate behavior towards minors with the potential for legitimate uses of the internet that might be crucial to that individual's rehabilitation.").

Additionally, because Dodson's criminal behavior was targeted towards McNamara, prohibiting Dodson from accessing the internet does not assist in his rehabilitation. Unlike the typical case involving a complete ban on internet use, such as in the case of a repeat sex offender,[10] Dodson's past criminal history and characteristics do not involve the internet in any way; instead, they heavily revolve around alcohol-related offenses. However, the record fails to reflect any circumstances indicating that the broad-sweeping computer restrictions are tailored to assist Dodson in his rehabilitation, deter repeat offenses, or protect the public. Nearly every facet of modern life involves the internet—from communicating with family to searching for jobs to using

---

[9] The government, in fact, requested that the Defendant "consent to [internet] monitoring and random examinations." PSR, R. 34, Page ID #204. This less restrictive version of the supervised release condition could be one example of an appropriately tailored internet restriction on Dodson, to the extent the district court finds such a restriction necessary.

[10] *See, e.g.*, *United States v. Greenberg*, No. 20-4318, 2021 WL 5373355, at *3 (6th Cir. Nov. 18, 2021) (noting that the internet plainly facilitates child-sex crimes and cataloging sex-offender cases upholding a total prohibition against internet use); *United States v. Lewis*, 565 F. App'x 490, 498 (6th Cir. 2012) ("The court clearly intended the restriction on computer usage to limit Lewis's ability to access pornographic materials . . . from the internet. The court analyzed and weighed Lewis's history in imposing this condition[,] and we find no abuse of discretion.").

Google Maps—making this a particularly harsh special condition. *Greenberg*, 2021 WL 5373355, at *3 ("We acknowledge that the internet's ubiquitous nature in today's modern life is practically unavoidable."). By imposing a supervised release condition that fails to advance the sentencing objectives in this case, and in light of Dodson's other unchallenged supervised release conditions, the district court abused its discretion in imposing such a broad internet ban. On remand, the district court should either appropriately narrow the blanket internet restriction in line with the above reasoning or remove the ban altogether.

### 2. Prohibition From Accessing Extremist Materials

In imposing the extremist materials restriction, the district court did not explicitly provide its reasoning, only stating: "I'm also going to restrict your viewing and possession of books, pamphlets, websites, blogs, chat rooms, videos, and social media platforms that reflect extremist or terroristic views, and that's going to be monitored by the Probation Department." Sent'g Hr'g Tr., R. 48, Page ID #260. Because the court neglected to provide reasoning supporting the extremist materials standard, such an imposition constituted procedural error. *See United States v. Kingsley*, 241 F.3d 828, 836 (6th Cir. 2001); *Inman*, 666 F.3d at 1006. Although a district court's failure to articulate reasons for conditions could be harmless error where the reasons are obvious based upon the record, no such clarity exists based upon this record. *See Inman*, 666 F.3d at 1005; *cf. Ritter*, 118 F.3d at 504–05.

This condition bears no relation to the nature of the instant offense involving threats and witness intimidation; instead, the condition tangentially relates back to the government's 2021 investigation of certain explosive items seized from Dodson's vehicle. To be sure, the district court is also permitted to select special conditions based on the Defendant's history and characteristics. *Kingsley*, 241 F.3d at 837. Although the government contends that the district

26

court heard ample testimony about Dodson's prior extremist views, the record does not reveal which allegations the district court relied upon or credited in imposing the extremist materials ban. Dodson was never convicted of possessing or creating explosive devices; everything seized from his vehicle during the traffic stop mentioned at trial was legal. Dodson pleaded guilty to lying to an agent of the United States, which is also largely unrelated to the prohibition against extremist materials. Further, even though the jury briefly heard testimony regarding Dodson's choices for tattoos and his violent history with McNamara, this information alone cannot warrant a complete prohibition on accessing extremist materials.[11]  The incidental past allegations and theories regarding explosive devices are too tangential to Dodson's criminal offense at issue to justify a total ban on all forms of media and literature reflecting "extremist views."

Both the district court's procedural error in failing to explain its reasoning for this condition, as well as the record's failure to adequately illuminate its appropriateness, require the Court to also vacate this special condition. The ambiguity of the "extremist materials" ban in its current formulation prevents Dodson from understanding the precise nature of the ban. Therefore, upon remand, the district court should either revisit the supervised release condition and specify the exact nature of the ban and the court's reasoning for the condition's implementation, or else relinquish the ban altogether. Importantly, any newly applied special condition must be "tailored to the specific case before the court." *Inman*, 666 F.3d at 1005.

---

[11] Dodson has claimed that the swastika was forcibly tattooed on him while he was unconscious, and the clown tattoo does not represent John Wayne Gacy, but rather a generic clown. Where the meaning of Dodson's distasteful tattoos is clearly disputed, the district court cannot rely on these tattoos as propagating extremist views.

**CONCLUSION**

For the reasons set forth above, this Court **AFFIRMS** Dodson's conviction and sentence, except with respect to the supervised release conditions; **VACATES** Dodson's challenged supervised release conditions; and **REMANDS** to the district court for further proceedings consistent with this opinion.